(No. 31899.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* SAM McCLAIN, Plaintiff in Error.

*Opinion filed November 27, 1951.*

JULIAN C. RYER, of Chicago, for plaintiff in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and JOHN S. BOYLE, State's Attorney, of Chicago, (JOHN T. GALLAGHER, RUDOLPH L. JANEGA, ARTHUR F. MANNING, and WILLIAM J. McGAH, JR., all of Chicago, of counsel,) for the People.

Mr. JUSTICE HERSHEY delivered the opinion of the court:

Plaintiff in error, Sam McClain, was indicted by the grand jury of the Cook County criminal court for the crime of murder in November, 1949. The indictment consisted of two counts. A plea of not guilty was entered and a jury trial held in the criminal court of Cook County. The plaintiff in error was adjudged guilty of murder and his punishment fixed at thirty-five years in the penitentiary. He now prosecutes this writ of error, contending that the evidence does not establish that he is guilty of murder beyond a reasonable doubt, that the trial court judge im-

properly instructed the jury, and that the defendant was prejudiced by the court's allowing the People's witnesses to identify the weapon used.

The undisputed facts evidenced by the record show that on October 7, 1949, at about 9:40 P.M., Sam Slater was killed by shots fired from a gun held in the hand of Sam McClain, the plaintiff in error. The homicide occurred in the rear room of the Cut Rate Liquor Store, a tavern operated by one Stanley Biel, located at 1501 Wentworth Avenue, Chicago Heights.

The plaintiff in error and the deceased had been employed for some time in the same department of the Gold Seal Roofing Company at Chicago Heights. Earlier in the day of the killing, while plaintiff in error and the deceased were working, they had a conversation with reference to the negotiation of a wager between them on a world series baseball game to be played that afternoon. McClain declined to wager unless the foreman under whom they worked would guarantee the bet if Slater lost. Silvio Rosati, the foreman, declined to do so.

After the game, the deceased, claiming to have won the bet, demanded that McClain pay him the five-dollar wager. McClain refused and an altercation developed, during which the deceased threatened McClain with a hammer. After leaving work that day McClain proceeded to several business establishments to pay his monthly bills, one of which was Salo's, a general merchandise store, dealing in household equipment and supplies. After paying his bill, a clerk suggested that he take with him a gun he previously left there for repair. Plaintiff in error took the gun and procured a round of ammunition. This visit to Salo's occurred about five o'clock in the afternoon. Later that evening McClain visited the place of business known as Cora's Tavern, located at the northwest corner of Fifteenth Street and Wentworth Avenue in Chicago Heights. He there encountered some friends whom he joined and soon there-

after was accosted by the deceased, who again demanded the payment of the wager. They became embroiled in an argument and were separated by Jack Gardner, a special police officer, who escorted them from the tavern.

Jack Gardner testified that this happened from fifteen to twenty minutes before the shooting which later occurred in the Cut Rate Liquor Store. The deceased then, apparently after leaving Cora's Tavern, entered the Cut Rate Liquor Store located on the southwest corner of Wentworth Avenue and Fifteenth Street and went back of the partition inside the rear room. According to the testimony of one Charlotte Watkins, she entered the Cut Rate Liquor Store about 9:30 o'clock and upon entering saw Slater standing just back of the partition inside the rear room and to the left of the door near the table. She was acquainted with Sam Slater and immediately walked back and engaged him in conversation. This is corroborated by the testimony of the bartender, A. G. Houston, who testified he saw Charlotte Watkins and the deceased so engaged in conversation and who further testified that while this conversation was taking place he saw McClain, the plaintiff in error, enter the tavern, walk back to the rear room, and go about half way to the washroom in the rear, and that thereupon McClain turned and stepped back a few paces and fired the gun repeatedly at Slater. Four shots were fired according to Houston. At the first shot Slater started to stagger and fell to the floor. Two shots were fired after Slater was on the floor. Charlotte Watkins further testified that at the time Slater was shot and while she was talking to him "he was standing at the table looking at the television with his right hand resting on the table and his left hand beside him * * * I and Sam still had conversation and as we were through he was standing there looking at the television and talking with I. That is when this fellow McClain fired. I did not see McClain come in. I only saw him after he first fired the shot." This woman

stood within two feet of the deceased when the first shot was fired.

Houston, the bartender, further testified that at the time the shots were fired McClain was within six feet of the deceased and that there was no conversation between McClain and Slater at that time.

One Martha Lathan, who was also in the tavern at the time of the shooting, testified that she saw Slater come in, that she later saw Charlotte Watkins come in, and observed Charlotte Watkins and the deceased talking just inside the rear room. She testified McClain later entered the room and then she saw McClain shoot the deceased, and that at that time Slater was standing by the table and did not move before the shots were fired.

All of these eyewitnesses related essentially the same account of the pertinent facts relative to the affair. There are no material inconsistencies between them, but each supports and substantiates the observations of the other. Although Houston, upon cross-examination, contradicts some of his testimony given at the coroner's inquest, his contradictions were not in any case of these pertinent facts.

Stanley Biel, owner of the tavern, also testified that he saw Sam McClain enter the tavern and soon thereafter heard shots from the back room.

The testimony of all these witnesses shows no immediate provocation upon the part of the deceased. It is admitted by the defense that Sam Slater was killed by shots fired by Sam McClain. There were six shots fired in all, five of which struck Sam Slater bringing about his immediate death. The evidence of the People is clear and convincing of the guilt of the defendant. Plaintiff in error claims, however, that a doubt is raised as to his guilt because of his claim of self-defense and the testimony in the record supporting it.

McClain, in his testimony, states that he entered the Cut Rate Liquor Store, and stood by one Isaiah Jackson,

who was playing the slot machine. Soon thereafter the deceased entered the tavern and upon seeing McClain opened his knife. The deceased then asked him for the five dollars which he refused to pay. Then declaring he was going to kill him, while calling him a vile name, he reached into his pocket where he had just placed the open knife.

Isaiah Jackson also testified that the deceased entered the tavern after McClain. Jackson had his back to McClain at all times, heard Slater demand money, or threaten McClain, and could not remember seeing anything in McClain's hand. Other than the testimony of Jackson, there is no support whatever offered by the defense for McClain's story. No one else that testified saw any scuffling or heard any words pass between McClain and the deceased before the fatal shots were fired. It is even controverted as to whether there was a slot machine in the tavern on that fatal night,—no conclusive proof being presented either way. Although there is evidence in this record that there had been a prior attack on McClain by the deceased with a hammer, the witnesses for the People who testified as being in the Cut Rate Liquor Store, agree that the deceased said nothing to the plaintiff in error and did not accost him in any manner.

We are thus brought to the consideration of whether a reasonable doubt could be entertained as to the guilt of the plaintiff in error from the evidence presented. On review this court will not disturb a verdict of guilt on the basis that the evidence is not sufficient to convict unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to justify entertaining a reasonable doubt of defendant's guilt. (*People* v. *Rudnicki,* 394 Ill. 351; *People* v. *Holt,* 398 Ill. 606; *People* v. *Smith,* 404 Ill. 125.) The evidence here on self-defense is irreconcilably in conflict,—not only as to the fact of imminent danger and fear of death, but as to who was

in the tavern, who entered first, and just where and how the fatal shots were fired.

This court has said, in *People* v. *Potts,* 403 Ill. 398, that "where the testimony of the accuser and the accused and their supporting witnesses is utterly irreconcilable, the issue is largely a question of determining the credibility of the witnesses and the weight to be given their testimony. This determination is best made by the jurors who see and hear the witnesses, and in such function this court will not substitute its judgment for that of a jury."

The jury here accepted the evidence of the People as being the correct version of what happened. The jurors' acceptance of the People's theory leaves nothing for this court to determine except whether there is sufficient evidence, if believed to be true, to prove defendant's guilt beyond a reasonable doubt. We are thus of the opinion that McClain's guilt was established beyond a reasonable doubt, and the jury was correct in finding that he was not motivated by a reasonable necessity of self-defense.

Plaintiff in error objects to instructions numbered 2 and 17 given on behalf of the People. People's instruction No. 2, which is complained of, told the jury that "as a matter of law, that before a defendant can avail himself of the right of self-defense, as the same is defined in these instructions, it must appear to him, acting as a reasonable person, that at the time of the killing the danger was apparently so urgent and pressing that in order to save his own life, or to prevent his receiving great bodily harm, the killing was absolutely necessary." The purpose of this instruction is not to set out those elements giving rise to a right of self-defense generally, but rather to show what the defendant must necessarily prove in order to justify this killing, which in this case is admitted by the defendant. A challenge to an instruction identical to the one here given was overruled by this court in *People* v. *Tamborski,* 356 Ill. 11, and in *People* v. *Gibson,* 385 Ill. 371, where it

was held that this same instruction on self-defense was not subject to criticism. Likewise, the same instruction here is free from attack.

People's instruction No. 17, which is complained of, told the jury "that although you may believe that the deceased made the first attack upon the defendant, yet if you further believe from the evidence beyond a reasonable doubt that the deceased died as the result of the wound inflicted by the defendant, in manner and form as charged in the indictment, and that under the circumstances at that time it did not appear to the defendant acting as a reasonable man that the infliction of such wound was necessary, or even apparently necessary, to save his own life, or to prevent his receiving great bodily harm, then the killing under such circumstances would not be justifiably under the plea of self-defense, as defined in these instructions, interposed in this case, and you should find the defendant guilty." The defense objects that this instruction required the defendant to be a reasonable man, and failed to tell the jury what allegations were "in the manner and form charged in the indictment," thus leaving to the jury's imagination the material allegations to be proved.

It is well settled that the test in self-defense is not what the jury thinks a reasonable man would believe, but rather what the defendant, as a reasonable man, believed. (*People* v. *Grady,* 381 Ill. 224.) This instruction only requires that the defendant's actions be considered on the basis of what he, as a reasonable person, believed to be true. There is no requirement that he be a reasonable man.

Had this been the only instruction concerning the wording "in manner and form charged in the indictment" there would have been reversible error by the court, since the jury would be left to its own determination of the material allegations to be proven. (*People* v. *McGown,* 388 Ill. 347.) The giving of such an instruction, however, has been held not to constitute reversible error where other

instructions given in the case define the essential elements of the crime with which the defendant is charged. *People v. McGown*, 388 Ill. 347; *People v. Berne*, 384 Ill. 334; *People v. Hartwell*, 341 Ill. 155; *People v. McGrane*, 336 Ill. 404.

An examination of the record discloses that the third instruction given on behalf of the People sets out all of the allegations that must be proved by the prosecution to find the defendant guilty. When these instructions are considered together the jury could not have been misled by the language complained of in instruction No. 17 given on behalf of the People.

The instructions, when considered as a series, fully and accurately advised the jury as to the law applicable to the case. We are satisfied that plaintiff in error had a fair trial and that the evidence shows his guilt beyond a reasonable doubt. There is no reversible error in the record.

The plaintiff in error complains that the trial judge failed to exclude testimony of witnesses Watkins and Houston, wherein they identified the defendant's gun as the same or similar to the one used to kill Slater, as incompetent and improper. We fail to see wherein such identification could be prejudicial to the defense, where there was absolutely no dispute as to the lethal weapon. The defendant admitted the shooting and that this gun was the weapon used. It is true that such identification might be an implied recognition of the reliability of the witnesses, but it is not the only fact upon which the jury might base its positive credibility determination. Inasmuch as the plaintiff in error fails to indicate wherein this evidence shows sufficient grounds of error, we are unable to see a basis for prejudicial error.

We have found a satisfactory determination of defendant's guilt with no room for a reasonable doubt on the basis of self-defense. The instructions given were proper, and there was no error in the refusal of instructions.

There being no error in the evidence allowed, in the absence of other circumstances we believe the plaintiff in error was justifiably convicted of murder.

The judgment of the Cook County criminal court is accordingly affirmed. *Judgment affirmed.*