OF

# THE SUPREME COURT

OF THE

## STATE OF ILLINOIS,

### NOVEMBER TERM, 1854, AT MOUNT VERNON.

++━━++

DECATOR CAMPBELL, Plaintiff in Error, *v.* THE PEOPLE, Defendants in Error.

### ERROR TO MASSAC.

On a trial for murder, where it appeared that the deceased sought the accused at his own house with the design to arrest or assault him, having a hatchet in his hand, it is competent for the accused to show that the deceased had, on the day of his death, and at other times shortly previous, made threats against him.

An instruction which may be understood by the jury as denying to the accused on trial for murder, the right to defend himself, unless his danger was not only apparently imminent, but was real and positive, is erroneous.

Actual and positive danger is not indispensable to justify self-defense.

If one is pursued or assaulted in such a way as to induce in him a reasonable and well-grounded belief that he is actually in danger of losing his life, or receiving great bodily harm, under the influence of such apprehension he will be justified in defending himself, whether the danger was real or only apparent.

Men, when threatened with danger, must determine from appearances and the actual state of things surrounding them, as to the necessity of resorting to self-defense; and if they act from reasonable and honest convictions, they will not be held responsible criminally, for a mistake in the extent of the actual danger, where other judicious men would have been alike mistaken.

Although it may be positively proved that one of two or more persons committed a crime, yet if it is uncertain which is the guilty party, all must be acquitted.

On a trial for murder, the law makes no distinction in its principles as to the color of the accused.

THIS cause was tried before PARRISH, Judge, at June term, 1854, of Massac Circuit Court.

J. JACK, for Plaintiff in Error.

J. A. LOGAN, District Attorney, for the People.

2

CATON, J. The plaintiff in error, who is a negro, was indicted for the murder of Goodwin Parker. The evidence in the case tends very strongly to show that the deceased made an assault upon the prisoner, and that the homicide was committed in necessary self-defense. It appears that the deceased and three others went to seek the prisoner at his father's house, in the night time. The deceased went to the door of the house, leaving his companions thirty or forty yards back, to whom he was to give warning if Campbell was in the house. Shortly after the deceased went to the door, he called to the others to come on, and informed them that the negro was there. They rushed up, when the deceased and the prisoner were seen some distance from the house, engaged together, and there the deceased was stabbed, and died in a few minutes. When the deceased went to the house, he had a hatchet in his hands, which was found near the spot where he was killed; and after the negro was committed to jail, a wound was observed upon his head which penetrated to the skull, and which appeared to have been made with a hatchet, an axe or a hammer. There was no pretense that there was any sort of justification or legal cause for arresting or assaulting the prisoner. Upon the trial, the defense offered to prove that on that day, and at other times shortly before his death, the deceased had made threats against the prisoner. This evidence the court ruled out, and an exception was taken. In this the court unquestionably erred, although they may never have come to the knowledge of the defendant till after the homicide was committed. If the deceased had made threats against the defendant, it would be a reasonable inference that he sought him for the purpose of executing those threats, and thus they would serve to characterize his conduct towards the prisoner at the time of their meeting, and of the affray. If he had threatened to kill, maim or dangerously beat the defendant, it would be a fair inference, especially so long as the evidence shows that he had a hatchet in his hands, that he had attempted to accomplish his declared purpose, and if so, then the prisoner was justified in defending himself, even to the taking of the life of his assailant, if necessary. While the threats, of themselves, could not have justified the prisoner in assailing and killing the deceased, they might have been of the utmost importance in connection with the other testimony, in making out a case of necessary self-defense. The evidence offered was proper, and should have been admitted.

The second instruction given for the prosecution, and which was excepted to, was as follows: "If the jury believe, from the evidence, that the defendant was pursued by the deceased, Goodwin Parker, and turned upon him and slew him with a

knife, or other instrument capable of producing a like death, when it was not necessary for self-preservation, or in necessary self-defense, or to prevent his receiving great bodily harm, although they believe there was no previous malice on the part of the defendant towards the deceased, yet they are bound to find the defendant guilty of manslaughter, and fix his term of confinement in the penitentiary of the State at not more than eight years." This instruction, if not absolutely wrong, was at least liable to misconstruction, and to be understood by the jury as depriving the defendant of the right of self-defense, unless his danger was not only apparently imminent, but was real and positive. If so understood, the instruction was wrong. If the defendant was pursued or assaulted by the deceased in such a way as to induce in him a reasonable and a well-grounded belief that he was actually in danger of losing his life, or suffering great bodily harm, when acting under the influence of such reasonable apprehension, he was justified in defending himself, whether the danger was real or only apparent. Actual and positive danger is not indispensable to justify self-defense. If one is assaulted with a sword in such a way as to indicate an intent to take his life, and with an apparent ability to accomplish such intent, he is not bound to stop and inquire whether the sword is but a lath, or whether the assault is but a jest, before he repels it with the necessary force to protect himself against the threatened harm. Or if one is assaulted with a pistol in such a way as to manifestly show a design to slay him, he may be justified in killing his assailant, although it should turn out the pistol was not loaded, and the only design was to frighten him. Men, when threatened with danger, are obliged to judge from appearances, and determine by the actual state of things, from the circumstances surrounding them, at least as much as if placed in other and less exciting positions; and it would be monstrous to say, that if they act from real and honest convictions, induced by reasonable evidence, they shall be held responsible criminally for a mistake in the extent of the actual danger, where other reasonable and judicious men would have been alike mistaken. A contrary rule would make the law of self-defense a snare and a delusion. It would become but a mockery of the sacred right of self-preservation.

The eleventh instruction asked by the prisoner should have been given. It is this: "If it is uncertain, from the evidence, in the minds of the jury, which one, out of two or more persons, inflicted the stab, that would operate to acquit the prisoner, unless there is proof that the prisoner aided or abetted the person ascertained to have killed him." While this instruction is inartificially drawn, and is liable to verbal criticism, yet it

contains an important principle of law, of the benefit of which the prisoner should not have been deprived. There was evidence tending to show that the mother and sister of the prisoner were at or very near the place of the affray at the time the wound was inflicted, and his counsel had the right to insist before the jury, that one of them struck the blow without his knowledge or procurement, while he was simply trying to flee from his pursuer; and had the jury so far concurred in that view of the case as to entertain a reasonable doubt whether one of the others did not strike the blow without the procurement of the prisoner, he was entitled to an acquittal. Although it may be positively proved that one of two or more persons committed a crime, yet if it is uncertain which is the guilty party, all must be acquitted. No one can be convicted till it is established that he is the party who committed the offense.

The thirteenth instruction asked for the prisoner, was this: "It is the duty of the jury to consider the prisoner's case as if he were a white man, for the law is the same, there being no distinction in its principles in respect of color." This, too, was refused by the court and an exception taken. It was not pretended on the argument, that the law of this case, by which the prisoner's guilt or innocence was to be established, was not precisely the same as if he were a white man, and it was even insisted on the argument, that the proposition is so plain and so universally understood and recognized, that it would have been an insult to the understanding of the jury for the court to have instructed them on that point. The proposition is undoubtedly exceedingly plain and altogether undeniable, and I trust is universally understood and recognized, but it was still the right of the prisoner to have the law, plain as it was, declared to the jury by the court. But again it was objected, that the instruction asserts the absolute equality, in all respects, under our law, of the black man with the white. Even if the wording of the instruction was thus broad, it could only be understood as applying to the case upon trial, where the equality is admitted. With the rights of the defendant in any other regard, the jury could have nothing to do. The only object of the instruction could have been to enlighten them as to the law of that case; and whether their belief of the relative rights of the defendant in other respects were right or wrong, was a matter of no sort of moment to any party. But by reference to the purport of the instruction, it will be seen that it was especially asked in reference to the case on trial, for the jury was asked to be directed to consider the prisoner's case as if he were a white man, for the reason that our law makes no distinction in respect of color, which, of course, can only be understood in respect

to such a case. Any other construction of that instruction is altogether too refined for practical justice. The instruction should have been given.

The judgment must be reversed and the case remanded.

*Judgment reversed.*