(No. 27672.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* AARON TURNER, Plaintiff in Error.

*Opinion filed January 20, 1944.*

R. B. HENDRICKS, and ROBERT RUTLEDGE, both of East St. Louis, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and LOUIS P. ZERWECK, State's Attorney, of Belleville, for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

The defendant, Aaron Turner, was indicted in the circuit court of St. Clair county for the murder, by stabbing, of Sam Ivory, also known as Sam Ivy. At the conclusion of the People's evidence, and again at the close of all the evidence, defendant made motions to instruct the jury to find him not guilty. Both motions were denied. A jury found him guilty of manslaughter. Defendant's motion for a new trial was overruled, and he was sentenced to the penitentiary for an indeterminate term of from one to fourteen years. He prosecutes this writ of error.

The fatal stabbing occurred September 5, 1942, between midnight and one o'clock A. M., and arose out of an altercation near an alley at the rear of a tavern located at Seventeenth street and Bond avenue, in East St. Louis, operated by a man named Lewis. Sam Ivory, a hod carrier, was described as being a strong, burly man, about thirty-four years old, five feet ten and one-half inches tall, and weighed approximately 235 or 240 pounds. Defendant is thirty-three years of age, his height five feet two inches, and his weight 160 pounds. Ivory spent the evening drinking in Lewis's tavern. Shortly before the stabbing, he became embroiled in an argument with a man described as resembling defendant, known only as "Lon," whom Ivory accused of owing him five dollars. Tom Lewis, a bartender and brother of the owner, and James Chandler, a patron, separated them and conducted Ivory eighty or ninety feet toward the rear of the premises where they stopped and endeavored to quiet him. At this juncture, defendant, a packing-house employee, arrived. According to defendant, after leaving his place of employ-

ment September 4, he attended a night baseball game, and was returning to his residence, a few doors west of Lewis's tavern. The night was dark, the nearest light being located across the street, and, as he attempted to drive his automobile into an alley abutting the tavern lot and his residential premises, he discerned figures whose identity he was unable to distinguish, at the sidewalk line blocking passage to the alley. He backed his car out and parked it alongside the street curb. Chandler and Lewis testified that as they were engaged in conversation with Ivory, defendant appeared and invited Ivory to take a ride with him to "cool off." Upon hearing defendant's voice, Ivory exclaimed, "There's the son-of-a-bitch that owes me five dollars," and shoved Chandler and Lewis aside, causing the latter to fall. Ivory advanced toward defendant, who moved backward. Ivory seized and grappled with him, and both fell to the ground about ten or fifteen feet from the sidewalk. Chandler, the first to reach the struggling pair, found defendant on his back with Ivory astride him, grasping defendant's wrists. According to Lewis and Chandler, they next heard Ivory say, "Aaron, man, you cut me," and "I didn't mean to fight you." Lewis added that defendant, at the same time stated, "Sam, I didn't go to cut you." Chandler further testified he then took from defendant a short butcher knife, admittedly owned by defendant, introduced in evidence as People's Exhibit 1. All witnesses agree Ivory had no knife or other weapon at any time. The only witness stating he saw the actual stabbing was West Gavin, employed by the owner to watch the tavern premises. He testified that defendant had the butcher knife in his hand when Ivory approached, and that when Ivory "made a lunge" at him, defendant "stuck him right away" in the region of the throat, before the two grappled and fell. Gavin's whereabouts at the time are not disclosed. Chandler testified that Gavin could have been at the scene, but that he was not present when Ivory was

escorted toward the alley by himself and Lewis. Lewis testified positively Gavin was not present when the fracas commenced.

The coroner, Dr. Clifford C. Kane, performed a *postmortem* examination on the body of Ivory September 8, 1942. He testified that there were seven distinct wounds, one being a deep laceration in the neck about the suprasternal notch, and that Ivory's death resulted from this cut and resulting hemorrhage.

A police officer, who investigated the death and interviewed defendant shortly after his detention, testified that defendant then denied the stabbing. Defendant's Exhibit "B," the report of the police investigation, states in part: "The fight between these men was the result of Ivory mistaking Turner for another negro that he had an argument with about some money a short time before."

Defendant testified that as he drew up to the curb he heard the men on the sidewalk arguing about money, and distinguished the voice of Ivory, an acquaintance since 1935, with whom he was on friendly terms, having annually for the past three years accompanied him to Marine, Mississippi, Ivory's home town. Upon recognizing Ivory's voice, he states that he slid from his seat and called to him, "Come on, Sam, let's go for a ride," and being under the impression Ivory was in financial difficulty, volunteered to advance him money, but that Ivory replied the money was owed to him. He further testified that the next thing he knew he was on his back, with Ivory on top of him; that he had not gone near the men, but was struck immediately after closing his car door, at a time when his back was turned, and that he was unaware who or what hit him until assisted off the ground. He identified two dark spots on his face and a scar above the right eye, claimed to have been a result of his encounter with Ivory. Defendant specifically denied owing Ivory five dollars, or any other amount, and stated that they never had any argu-

ment about money. Defendant's wife corroborated his testimony as to Ivory and her husband being on very friendly terms and as to the scars on defendant's face. Two witnesses testified as to defendant's good reputation as a law-abiding citizen.

Defendant contends the evidence is insufficient to prove manslaughter beyond a reasonable doubt, but insists it does clearly establish that he acted in defense of his person in inflicting the injuries causing the death of Ivory, and that in doing so he acted as any ordinarily prudent person would have done under the same circumstances. The crime of manslaughter is embraced in the charge of murder, and, under an indictment for murder, where a homicide is proved but proof of the requisite malice is lacking, a conviction for manslaughter is proper if justified by the evidence. (*People* v. *Lewis,* 375 Ill. 330.) Section 155 of division I of the Criminal Code provides that in homicide cases, the killing having been proved, the burden of proving circumstances of mitigation, or that justify or excuse the homicide, devolves upon the accused. (Ill. Rev. Stat. 1943, chap. 38, par. 373.) The court did not err in refusing to direct a verdict, as the evidence shows the deceased was killed by defendant, and the question whether he was guilty as charged was, under the evidence, one wholly for the jury. *People* v. *Brindley,* 369 Ill. 486.

The case was close on the facts. Since the evidence was conflicting and confusing, it was highly important that the jury should have been accurately instructed. Although not testifying in so many words, defendant, in effect, admitted the killing, and his only defense, as indicated by instructions tendered, was that he acted in self-defense. At the request of the People, the court gave to the jury, among others, instruction No. 5. As contended by defendant, this instruction is erroneous in two respects. That part of the instruction which tells the jury "it must appear that at the time of the killing the danger was apparently

so urgent and pressing," does not properly present the issue. The true test is what the defendant, acting as a reasonable man, believed was necessary, not whether the jury believed from the evidence that it was necessary or apparently necessary. (*People* v. *Clark,* 368 Ill. 183.) The instruction was further erroneous in advising the jury that "it must also appear that the person killed was the first assailant, or that the defendant had really and in good faith endeavored to decline any further struggle before the mortal wound was inflicted." This portion of the instruction is misleading and inapplicable to the facts in evidence. It is uncontradicted that Ivory was the assailant, and there was no previous struggle upon which to base a declination of further combat before the mortal wound was inflicted. As pertinently observed in *People* v. *Williams,* 337 Ill. 371, "The rule in a case such as this is, that if one who is not the first assailant be put in apparent danger of his life or great bodily harm he need not attempt to escape but may lawfully stand his ground and meet force with force, even to the taking of his assailant's life, if necessary or apparently necessary to save his own life or to prevent great bodily harm." *People* v. *Newman,* 363 Ill. 454, and *People* v. *Sterankovich,* 313 Ill. 556, are to the same effect. Moreover, it is not necessary that the deceased should have used against his slayer a deadly weapon to justify a killing in self-defense. If the slayer was confronted with such means or force as to induce a reasonable apprehension he was in danger of loss of life or of suffering great bodily harm, this is all the law requires in order to justify the homicide. (*People* v. *Motuzas,* 352 Ill. 340; *People* v. *Organ,* 345 Ill. 339.) It follows that the refusal of the trial court to give instructions tendered by defendant, embodying the principles pertaining to self-defense above enunciated, likewise constituted error.

Instruction No. 1, which defines murder and express and implied malice, and instruction No. 4, defining volun-

tary manslaughter, are criticized because they ignore the theory of self-defense. These instructions, in themselves, correctly set forth the law pertaining to the particular subjects embraced, and neither of them directed a verdict. They must be considered with reference to other instructions containing a proper exposition of the law pertaining to self-defense, and when read as a series, and so considered, they neither ignore nor nullify the theory of self-defense. *People* v. *Grady,* 381 Ill. 224.

For errors in giving and refusing instructions, the judgment of the circuit court is reversed and the cause is remanded.

*Reversed and remanded.*